UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

DAVID HEATH ELLIS, individually, and
DEVCO BUILDING AND CONSTRUCTION, INC.,
a West Virginia corporation,

            Plaintiffs,

v.                                     Civil Action No. 2:14-cv-24641

MICHAEL THORNSBURY, individually and
in his official capacity, and
JARROD FLETCHER, individually and
in his official capacity, and
FORMER TROOPER BRANDON MOORE, individually and
in his official capacity,

            Defendants.


                    MEMORANDUM OPINION AND ORDER

            Pending are the three defendants' motions to dismiss

plaintiffs' amended complaint, filed by defendants Michael

Thornsbury and Jarrod Fletcher on October 21, 2015, and by

defendant Brandon Moore on October 22, 2015.


                          I. Background


            This action arises from defendants' alleged service of

subpoenas to investigate a crime that plaintiffs say never

happened.  Defendants are former state officials who worked in

Mingo County, West Virginia.  Michael Thornsbury was a circuit

judge, Brandon Moore served as a state trooper, and Jarrod

Fletcher was a grand jury foreman.  Plaintiff David Heath Ellis

owns Devco Building and Construction, Inc., and Devco is also a
plaintiff in this action.

          According to the complaint, the three "[d]efendants .
. . deprive[d] Plaintiff of his civil rights by causing . . .
totally frivolous subpoena[s] to be served upon Plaintiff David
Heath Ellis," as well as upon his business, Devco, and on one
with whom Devco did business, the Hampden Coal Company.  See
Plaintiff's Amended Complaint (hereinafter "Pl. Compl.") ¶ 7.
"[T]he subpoenas issued to Plaintiffs and Hampden Coal Company
requested information relating to the sale of scrap metal
between Plaintiff Devco and Hampden."  Pl. Compl. ¶ 18.
"Plaintiffs assert that the [subpoenas were] purposefully
crafted to insinuate that Plaintiffs were part of a scheme to
steal mining bits, a claim that defendants knew was false."  Pl.
Compl. ¶ 18.  Plaintiffs appear to claim that the subpoenas
"were sought . . . to frame Robert Woodruff," Pl. Compl. ¶ 21,
plaintiff Ellis's uncle, for Grand Larceny, presumably for
stealing mining bits, Pl. Compl. ¶ 9.

          The complaint alleges that the three defendants were
working together to help defendant Thornsbury seduce his
secretary, Kim Woodruff, who was Robert Woodruff's wife, Pl.
Compl. ¶ 30, and also to ensure that Kim Woodruff would not file
a sexual harassment lawsuit against Thornsbury because of his

                              2

advances, Pl. Compl. ¶ 11.  Evidently, defendants felt that
their plan would be furthered by implicating Kim Woodruff's
husband, Robert, in a criminal scheme.  In order to build the
case against Robert Woodruff, and also to "ruin Plaintiffs
[Ellis and Devco's] standing in the community, and more
specifically, ruin their reputation with Hampden Coal Company,"
by implicating them in a criminal scheme, Pl. Compl. ¶ 19,
defendants had Trooper Moore serve the subpoenas.

Plaintiffs allege that defendants met to author the
subpoenas, and that they engaged in a range of illegal conduct
to ensure that the documents were approved by a grand jury and
served:

> Defendant Fletcher was never on the official grand
> jury list, but was placed on it by Defendant
> Thornsbury, because he was part of the conspiracy
> against Plaintiffs and Robert Woodruff. . . .
> Defendant Fletcher [served] illegally as foreman of
> the Grand Jury, which position was prohibited to him
> by law because he was at the same time [an] agent of
> the State.
>
> Defendant Thornsbury met with Defendant Fletcher at
> the "Wine Seller", a business owned by their real
> estate development company.  While there Defendant
> Thornsbury dictated the contents of the grand jury
> subpoenas to another man, and demanded that Defendant
> Fletcher persuade the grand jury to issue them. . . .
> Defendant Fletcher, contrary to the law of West
> Virginia, signed the offending subpoena as foreman of
> the Grand Jury when appropriately all subpoenas are
> signed by the prosecuting attorney. . . .

3

> [T]he subpoenas issued to Plaintiffs and Hampden Coal
> Company requested information relating to the sale of
> scrap metal between Plaintiff Devco and Hampden Coal
> Company.  Plaintiffs assert that the information
> sought was purposefully crafted to insinuate that
> Plaintiffs were part of a scheme to steal mining bits,
> a claim that defendants knew was false. . . .
>
> Defendant Thornsbury instructed Defendant Moore to
> serve the grand jury subpoenas upon the Plaintiffs and
> Hampden Coal Company.  At all relevant times
> Defendants Thornsbury and Moore knew that Plaintiffs
> and Robert Woodruff had not violated any law, but were
> issuing the subpoenas in order to ruin Plaintiffs[']
> standing in the community, and more specifically, ruin
> their reputation with Hampden Coal Company.
>
> Defendant Moore, using the color of his office,
> paraded around the Hampden Coal Company headquarters
> in a deliberate effort to make the officers and
> employees uncomfortable and to interfere with Hampden
> Coal Company's relationship with the Plaintiffs.

Pl. Compl. ¶¶ 12-20.  Plaintiffs claim that they suffered a
number of injuries, including the need to pay attorneys' fees,
Pl. Compl. ¶ 22, embarrassment in the community, Pl. Compl. ¶
27, and the risk of incarceration, Pl. Compl. ¶ 32.  Plaintiffs
also claim that Hampden's "executives [became] fearful that they
were on the wrong side of the Mingo County political structure,
[and so] Hampden Coal Company ceased doing business with
Plaintiffs," resulting in lost business income of $4 million,
Pl. Compl. ¶ 31.

Plaintiffs also claim as follows:

> When Plaintiffs decided to fight the grand jury
> subpoena their counsel was informed by Mingo County
> Prosecuting Attorney Michael Sparks that Defendant
> Thornsbury had decided to issue a capias for
> [plaintiff] Ellis['s] arrest.  Plaintiff Ellis was
> then forced to leave his home to avoid being arrested.
> Further, Plaintiff had to live in fear that . . . his
> liberty would be taken from him until Defendant
> Thornsbury was finally removed from the bench for his
> illegal activity.

Pl. Compl. ¶ 24.  It is not alleged that a capias was ever
issued.

In an order entered September 25th, 2015, the court
dismissed all of plaintiffs' counts, but gave leave to amend the
complaint so that plaintiffs could revive, if possible, their
claims for state-law libel and for violation of the Due Process
Clause of the Fourteenth Amendment brought pursuant to 42 U.S.C.
§ 1983.  Plaintiffs submitted an amended complaint on October 9,
2015.[1]

All three defendants have again moved to dismiss
plaintiffs' two claims.  Regarding the libel claim, all of the
defendants contend that plaintiffs fail to identify a defamatory
statement, and fail to allege that any such statement was false

---

[1] The first paragraph of the amended complaint makes mere mention
of a claim for negligence, but it is not otherwise alleged in
the two-count amended complaint.  Accordingly, it is dismissed.

or non-privileged.  <u>See</u> Mem. in Supp. of Def. Moore's Mot. to
Dismiss at *11-12; Mem. in Supp. of Def. Thornsbury's Mot. to
Dismiss at *9-10.  Defendant Fletcher raises concerns about
additional elements of the libel claim as well, claiming that
the statements in the subpoenas were not false, that the
statements did not refer to plaintiffs, and that Fletcher did
not publish any defamatory statements.  Mem. in Supp. of Def.
Fletcher's Mot. to Dismiss at *7-8.  Regarding the Due Process
claim, all three defendants contend that plaintiffs have failed
to allege that they were deprived of property or liberty, which
is necessary for a claim under the Due Process Clause.  Mem. in
Supp. of Def. Thornsbury's Mot. to Dismiss at *7-8; Mem. in
Supp. of Def. Moore's Mot. to Dismiss at *7-8; Mem. in Supp. of
Def. Fletcher's Mot. to Dismiss at *4-6.  Defendants argue, as
well, that the official-capacity lawsuits against each of them
should be dismissed because they make claims against the state
of West Virginia, which is not a "person" as that term is used
in 42 U.S.C. § 1983.

## II. The Motion to Dismiss Standard

        Federal Rule of Civil Procedure 8(a)(2) requires a
plaintiff's complaint to contain "a short and plain statement of
the claim showing . . . entitle[ment] to relief."  Fed. R. Civ.
P. 8(a)(2); <u>Erickson v. Pardus</u>, 551 U.S. 89, 93 (2007).  Rule

6

12(b)(6) correspondingly permits a defendant to challenge a complaint when it "fail[s] to state a claim upon which relief can be granted . . . ."  Fed. R. Civ. P. 12(b)(6).

The required "short and plain statement" must provide "'fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957), overruled on other grounds, Twombly, 550 U.S. at 563); see also Anderson v. Sara Lee Corp., 508 F.3d 181, 188 (4th Cir. 2007). The showing of an "entitlement to relief" must amount to "more than labels and conclusions . . . ."  Twombly, 550 U.S. at 555. "[A] formulaic recitation of the elements of a cause of action will not do."  Id.; Giarratano v. Johnson, 521 F.3d 298, 304 (4th Cir. 2008).  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570); see also Monroe v. City of Charlottesville, 579 F.3d 380, 386 (4th Cir. 2009).

When evaluating the motion, a district court is required to "'accept as true all of the factual allegations contained in the complaint . . . .'"  Erickson, 551 U.S. at 94 (quoting Twombly, 550 U.S. at 555-556); see also South Carolina

7

<u>Dept. Of Health And Environmental Control v. Commerce and</u>

<u>Industry Ins. Co.</u>, 372 F.3d 245, 255 (4th Cir. 2004) (quoting

<u>Franks v. Ross</u>, 313 F.3d 184, 192 (4th Cir. 2002)).  Factual

allegations are to be distinguished from legal conclusions,

which the court need not accept as true.  <u>Iqbal</u>, 556 U.S. at 678

("the tenet that a court must accept as true all of the

allegations contained in a complaint is inapplicable to legal

conclusions").  The court must also "draw[] all reasonable . . .

inferences from th[e] facts in the plaintiff's favor . . . ."

<u>Edwards v. City of Goldsboro</u>, 178 F.3d 231, 244 (4th Cir. 1999).


### III. Discussion

       As noted, plaintiffs' complaint contains two causes of

action, namely, state-law libel and violation of 42 U.S.C. §

1983.  The court turns first to the libel claim contained in

Count II, and then to the constitutional claim in Count I.


### A.  Libel

       Count II of the complaint alleges that defendants

libeled the plaintiffs.  In briefing this motion, plaintiffs

summarize how they believe they were libeled:

       Plaintiffs state the subpoenas issued requested
       information relating to the sale of scrap metal
       between Plaintiff Devco and Hampden Coal Company, and

8

> the information sought was purposefully crafted to
> insinuate that Plaintiffs [along with Robert Woodruff]
> were part of a scheme to steal mining bits, a claim
> that defendants knew was false.  [Pl. Compl. ¶ 18.]
> Plaintiffs state in their Amended Complaint that
> Defendants Thornsbury and Moore knew that Plaintiffs
> had not violated any law, but were issuing the
> subpoenas in order to ruin their standing in the
> community, and more specifically, ruin their
> reputation with Hampden Coal Company.

Pl. Resp. to Def. Moore's Mot. to Dismiss at *7.  Their theory
is thus that defendants libeled the plaintiffs by serving upon
them subpoenas that suggested they had committed criminal
activity, even though defendants knew the suggestion to be
false.  The complaint plainly contains all of these allegations.
Pl. Compl. ¶¶ 10, 16, 18, 19.

In West Virginia, "[d]efamation published in written
form, as opposed to spoken form, constitutes libel."  Greenfield
v. Schmidt Baking Co., 199 W. Va. 447, 450 (1997).  A libel
claim alleged by a non-public figure is evaluated under the six-
part test for defamation set forth in Crump v. Beckley
Newspapers:

> The essential elements for a successful defamation
> action by a private individual are (1) defamatory
> statements; (2) a nonprivileged communication to a third
> party; (3) falsity; (4) reference to the plaintiff; (5)
> at least negligence on the part of the publisher; and
> (6) resulting injury.

173 W. Va. 699, 703 (1983), see also Greenfield, 199 W. Va. at
455 (applying the Crump standard in action for libel by private
figure).

      Plaintiffs have satisfied the first element by
alleging that the subpoenas, and statements made when they were
served, were defamatory.  The Crump opinion clarified that
identifying "direct defamatory statements" is not necessary,
since "defamation may also be accomplished through inference,
implication, innuendo or insinuation."  Crump, 173 W. Va. at
706.  The complaint alleges that the subpoenas were designed to
imply that plaintiffs had been involved in criminal activity.
Pl. Compl. ¶ 18.  Because of the subpoenas' association with a
criminal investigation and the highly public and flamboyant
manner in which they were served by defendant Moore, the
subpoenas led the public to believe that the plaintiffs were
justifiably suspected of criminal misconduct.  Pl. Compl. ¶¶ 20,
27, 31.  Plaintiffs allege, in particular, that Defendant Moore
"paraded around the Hampden Coal Company headquarters," Pl.
Compl. ¶ 20, presumably while serving one of the subpoenas, that
the community thereafter "held Plaintiffs up to obloquy,
ridicule, and contempt," Pl. Compl. ¶ 27, and that, as a result,
"Hampden Coal Company ceased doing business with Plaintiffs,"
Pl. Compl. ¶ 31.  Thus, the alleged subpoenas rose to the level

of "implication, innuendo or insinuation" that "lower[ed] [the plaintiffs] in the estimation of the community" and "deter[red] third persons from associating or dealing with [them]," see Crump, 173 W. Va. at 706.

Second, plaintiffs must allege that the statements were made via a nonprivileged communication.  Here, defendant Fletcher contends that plaintiffs fail to satisfy this element because the means by which the statements were delivered – subpoena – were privileged as part of a legal proceeding.  The other two defendants simply state, with no elaboration, that plaintiffs have failed to allege that the defamatory statements were not privileged.

Plaintiffs contend that the privilege for documents in litigation should not apply because the subpoenas had severe legal defects, making them more like private activity than documents issued by the government in an official proceeding. In the complaint, plaintiffs emphasize that Fletcher, who was Thornsbury's business partner, was serving illegally on the grand jury, that Thornsbury dictated the language found in the form subpoena, and that Fletcher's signature allowed the subpoena to be served.  Pl. Compl. ¶ 12-17.  In their brief opposing this motion, plaintiffs clarify their view of the

11

extra-governmental character of the subpoenas in this case,
referring to them as "bogus" documents, and stating that

> Litigation privilege cannot fairly be said to extend
> to documents created at a wine bar by men engaged in a
> conspiracy to indict a man so the judge can have an
> affair with his wife and . . . destroy his nephew's
> business.

Pl. Resp. to Def. Fletcher's Mot. to Dismiss at *8.


     The Crump opinion identifies two classes of privileged
communication, absolute and qualified.  Crump, 173 W. Va. at
706.  Qualified privilege, which applies only to certain
communications "made in good faith," cannot apply here because
plaintiffs have alleged, repeatedly, that all three defendants
acted in bad faith.  See, e.g., Pl. Compl. ¶ 18 ("Plaintiffs
assert that the information sought was purposefully crafted to
insinuate that Plaintiffs were part of a scheme to steal mining
bits, a claim that defendants knew was false.").  Defendants may
only prevail if their conduct was covered by absolute privilege,
which applies to "legislative, judicial and quasi-judicial
proceedings and other acts of the State."  Crump, 173 W. Va. at
706 (citing Parker v. Appalachian Electric Power Co., 126 W.Va.
666, 672 (1944)).

     The court notes, first, that defendants cite no case
in which absolute privilege has been extended to subpoenas, the

12

central means by which defamation was conveyed in this case. No case in West Virginia affords them absolute privilege, and defendants have not cited any authority supporting this contention. Subpoenas perform an investigative function comparable to the activities of police officers, and, in West Virginia, officers receive only a qualified privilege for their statements. City of Mullens v. Davidson, 133 W. Va. 557, 564 (1949).

Second, because of severe and highly unusual deficiencies in the grand jury proceedings described in this case, the body's actions had no legal effect, and were likely not "acts of the State" worthy of absolute privilege. One major deficiency identified by plaintiffs was the irregular selection of jurors. See State ex rel. Burgett v. Oakley, 155 W.Va. 276 (1971). In Oakley, the Supreme Court of Appeals considered a petition for habeas corpus brought on the basis that grand jurors had been selected by the wrong officials. The court ruled that, because "the jury commissioners selected by the Circuit Clerk . . . were illegally appointed," "the indictment found against petitioner by the . . . Grand Jury of Logan County was a nullity thereby rendering his conviction thereunder void." 155 W.Va. at 282; see also State v. Pancake, 170 W. Va. 690, 697

(1982)(holding that statutory provisions requiring that jury list not be "improperly compiled" are "mandatory").[2]

Here, plaintiffs have claimed that "Fletcher was never on the official grand jury list, but was placed on it by Defendant Thornsbury, because he was part of the conspiracy against Plaintiffs and Robert Woodruff."  Pl. Compl. ¶ 12.  If defendant Thornsbury himself placed Fletcher on the grand jury list, it was a plain violation of W. Va. Code § 52-2-3, governing the selection process for grand jurors, which states as follows:

> When required by the circuit court or the chief judge thereof, the clerk shall draw the names of sixteen persons from the jury wheel or jury box, and the persons so drawn shall constitute the grand jury.  At the same time, the clerk shall draw the names of such additional numbers of persons from the jury wheel or jury box as the chief judge of the circuit, or the judge in a single judge circuit shall by prior order direct, and the persons so drawn shall constitute alternate jurors for the grand jury.  The judge may replace any absent members of the grand jury from among the alternate grand jurors, in the order in which the alternate jurors were drawn.

---

[2] Given the holding of <u>Oakley</u>, the court understands West Virginia law to distinguish between the improper service of individual jurors, which will not void an indictment per W. Va. Code § 52-2-12, as opposed to an improper juror selection mechanism, which may void the grand jury's indictments and other acts.

W. Va. Code § 52-2-3.  Additional provisions specify that the "jury wheel" and "jury box" include names "taken from the master list," a list which is to be compiled by the clerk from a number of registries of persons living in the area.  W. Va. Code §§ 52-1-5; 52-1-3.  The selection process, in other words, requires the clerk to make a list of the persons eligible to serve, and to retrieve names from that list at random.  The judge has no authority to add persons not on the official list.  If Thornsbury added Fletcher to the grand jury list, thus subverting the neutral selection process described in the statute, then the selection process was fundamentally illegal, and the grand jury's acts, including the subpoena in question, were legal nullities.  <u>Oakley</u>, 155 W.Va. at 282.  The court notes that Thornsbury's selection of Fletcher, who was not on the list, likely violated a number of other significant provisions of state law as well.  <u>See</u>, <u>e.g.</u>, W. Va. Code §§ 52-1-5 (discussing juror lists); 52-1-5(a) (discussing forms to be completed by potential jurors); <u>see</u> <u>also</u> § 52-2-2 (stating that provisions governing petit juries, to the extent feasible, also govern grand juries).

Plaintiffs have alleged far more than this one legal irregularity.  They also claim, as noted above, that "Defendant Fletcher failed to answer affirmatively that he was an office

15

holder," and that he was thus "serving illegally as foreman of the Grand Jury, which position was prohibited to him by law because he was at the same time [an] agent of the State," serving as the "emergency services director" in Mingo County.[3] Pl. Compl. ¶ 3.  This presumably refers to the requirement in W. Va. Code § 52-1-8(d)("A prospective grand juror is disqualified to serve on a grand jury if he or she is an officeholder under the laws of the United States or of this state").

Plaintiffs also allege, more generally, that defendant Thornsbury made the grand jury an instrumentality for his own use rather than an agency conducting the work of the state.  He did so by putting his business partner on the panel and secretly directing its activities, even though the essence of a jury's function is its independence from outside state control.  Pl. Compl. ¶ 12-17.

Plaintiffs have alleged, in short, that the acts of the grand jury were nullities because of severe legal defects in the process of juror selection; that Fletcher served illegally on the jury; and that the body essentially ceased to function as a well-ordered governmental entity in the usual sense, instead serving as Thornsbury's personal weapon against plaintiffs.  If

_____

[3] It is understood that Fletcher was Mingo County's 911 Director and Homeland Security Director.

so, its acts did not fall into the category of "judicial and quasi-judicial proceedings and other acts of the State," Crump, 173 W. Va. at 706, which may receive absolute privilege, but instead are best understood as overreaching communications by private parties.  Absolute privilege does not apply to such communications.

Even supposing that the grand jury's acts were not so defective as to be essentially extra-legal, defendants' conduct still does not receive absolute privilege by reason of its relation to "judicial and quasi-judicial proceedings and other acts of the State."  Crump, 173 W. Va. at 706.  Government officers enjoy absolute privilege from defamation in official proceedings only as far as their de jure powers reach.  See Carey v. Dostert, 185 W.Va. 247, 255 (1991); cf. Forrester v. White, 484 U.S. 219, 227 (1988).  For example, only while "performing his judicial function" is a judge "absolutely privileged to publish defamatory matters."  Carey, 185 W.Va. at 255.  A judge does not, by contrast, receive "absolute defense to a libel or defamation charge" for "'acts that simply happen to have been done by judges.'"  Carey, 185 W.Va. at 254 (quoting Forrester, 484 U.S. at 227); see also Restatement (Second) of Torts § 585; (1977)("A judge or other officer performing a judicial function is absolutely privileged to publish defamatory

17

matter <u>in the performance of the function</u> if the publication has some relation to the matter before him.")(emphasis added).  And numerous cases in state and federal law illustrate the reach of a judge's official duties.  In <u>Roush v. Hey</u>, for example, a litigant sued a judge for defamation after the judge appeared on television and discussed details of the litigant's case.  197 W.Va. 207 (1996).  The Supreme Court of Appeals reversed the lower court's grant of summary judgment to the judge, reasoning that a talk show appearance was not, at least in that instance, a judicial act.  <u>Id.</u> at 213-15.  Likewise, other officials involved in the litigation process are privileged from defamation claims only insofar as they carry out their official duties.  <u>See</u>, <u>e.g.</u>, Restatement (Second) of Torts § 589 (1977)(stating that jurors are privileged to publish defamatory material only in the performance of their official functions).

        To begin, defendant Thornsbury's conduct was not a judicial act that supplied an absolute privilege from defamation claims.  The United States Supreme Court and the West Virginia Supreme Court of Appeals have stated a two-part test for determining "whether a judge's act is a 'judicial' one."  <u>Roush</u>, 197 W. Va. at 212.

        The first factor is whether the act was a function
        normally performed by a judge. This turns on the
        nature of the act itself and not on the identity of

18

> the actor. The second factor is whether the parties
> dealt with the judge in his judicial capacity; this
> factor looks to the expectation of the parties.

Id. at 212-13 (citing Stump v. Sparkman, 435 U.S. 349, 362

(1978)).  Plaintiffs allege that defendant Thornsbury dictated a

subpoena to Fletcher at a wine store, and demanded that Fletcher

persuade the grand jury to issue it.  Pl. Compl. ¶ 16.  Judges

do not "normally perform" the function of authoring subpoenas

that emanate from grand juries, or otherwise prescribing the

outcomes of grand jury proceedings.  Indeed, the Supreme Court

of Appeals has explicitly ruled that a judge has no power to

interfere directly in grand jury proceedings.  See State ex rel.

Hamstead v. Dostert, 173 W.Va. 133 (1984).


        Second, the parties did not "deal[] with the judge in

his judicial capacity."  Plaintiffs did not deal with Thornsbury

at all — his meeting was only with Fletcher and co-conspirators.

Presumably, even if plaintiffs had been involved with the

proceedings, they would have had no "expectation" that

Thornsbury, a sitting judge, would dictate subpoenas to a grand

jury foreman, particularly for malicious and personal reasons.

Thus, defendant Thornsbury's actions were not judicial ones, and

no privilege applies.

Defendant Fletcher contends that, if he published any
defamatory material, it was strictly within the performance of
his official duties as the foreman of the grand jury.  Although
West Virginia courts have not ruled on the scope of defamation
privilege afforded to jurors, other courts have done so:

> Both grand and petit juries are arms of the court and
> in performance of the duty imposed on them they are
> privileged to publish false and defamatory matter if
> any of it has some relation to the cause in which they
> are acting as a jury.

Ryon v. Shaw, 77 So. 2d 455, 457 (Fla. 1955); see also
Restatement (Second) of Torts § 589 (1977)("A member of a grand
or petit jury is absolutely privileged to publish defamatory
matter concerning another in the performance of his function as
a juror, if the defamatory matter has some relation to the
proceedings in which he is acting as juror.").  This rule is
parallel to the defamation privilege afforded to judges while
conducting their official duties.  Carey, 185 W.Va. at 255.

The Supreme Court of Appeals has described the
functions of a grand jury in sweeping terms:

> [O]nce a grand jury is properly selected, the judge
> appoints a foreman.  W.Va.Code § 52-2-5 (1981
> Replacement Vol.).  After that appointment, the grand
> jury has an independent existence proscribed only by
> the court's limited supervisory powers, the grand
> juror's oath, and the applicable rules of criminal
> procedure.  Once their oath is administered, the grand

20

>       jurors become officers of the court with the duty to
>       "diligently inquire and true presentment make of all
>       such matters as may be given you in charge or come to
>       your knowledge ...."  W.Va. Code § 52-2-5.

State ex rel. Miller v. Smith, 168 W. Va. 745, 756-57 (1981).


        The complaint alleges that Fletcher committed a number

of wrongful activities plainly outside the scope of any duties

of a grand juror.  Plaintiffs allege that "Fletcher . . . wished

to intimidate and harass Plaintiff David Heath Ellis," Pl.

Compl. ¶ 11, and that, "[a]s a matter of system, Defendants

Thornsbury, Moore and Fletcher regularly collaborated on

projects designed to further the nefarious schemes of Defendant

Thornsbury."  Pl. Compl. ¶ 25.  Pursuant to this practice,

Fletcher "met with Defendant [Thornsbury] at the 'Wine Seller',

a business owned by their real estate development company," Pl.

Compl. ¶ 16, out of the presence of the grand jury.  Plaintiffs

directly assert that "Defendant Thornsbury dictated the contents

of the grand jury subpoenas," and, in light of plaintiffs'

assertion of an ongoing conspiracy between the three defendants,

the court infers that Fletcher played a role in helping the

judge craft the subpoenas and strategize as to how he could

improperly influence the grand jury.  Any of Fletcher's actions

in helping Thornsbury plan to "usurp the power of the grand

jury," see State ex rel. Hamstead v. Dostert, 173 W.Va. 133,

141, fell far outside Fletcher's official duty to "diligently

inquire" and make "true presentment" as to criminal allegations, as Fletcher knew that no crime had been committed, Pl. Compl. ¶ 18.  Thus, no privilege applies as to those actions, which, if provable, are sufficient to sustain the defamation claim against Fletcher.

Defendant Moore flatly asserts that "Plaintiffs fail to allege that any of the alleged libelous statements made by Trooper Moore were non-privileged."  Def. Moore's Mem. in Supp. of Mot. to Dismiss at *12.  Yet, as stated above, Moore's alleged conduct extended beyond preparing the subpoenas, and involved serving them while needlessly intimidating plaintiffs' business partners.  The complaint states, in part, that:

> Defendant Moore, using the color of his office, paraded around the Hampden Coal Company headquarters in a deliberate effort to make the officers and employees uncomfortable and to interfere with Hampden Coal Company's relationship with the Plaintiffs.

Pl. Compl. ¶ 20.

Under West Virginia law, "the statements or the communications of a . . . police officer are not within" the scope of absolute privilege from defamation, but instead are "qualifiedly or conditionally privileged communication[s]" and therefore protected "when made in good faith."  City of Mullens, 133 W. Va. at 564 (internal quotation marks and citations

22

omitted).  Making all inferences in plaintiffs' favor, the court
reads the complaint to assert that Moore announced to Hampden's
management, for malicious purposes, that an investigation into
Hampden and its business partners was ongoing, and that he
behaved in a threatening manner while doing so.  Pl. Compl. ¶
20.  Plaintiffs have plainly asserted that Moore's actions were
taken in bad faith.  Thus, Moore's entitlement to any qualified
privilege will not defeat plaintiffs' claim.[4]

Also in question is whether the plaintiffs have
successfully identified a <u>false</u> statement.  As the Supreme Court
of Appeals explained in <u>State ex rel. Suriano v. Gaughan</u>:

> The common law of libel takes but one approach to the
> question of falsity, regardless of the form of the
> communication. [...] It overlooks minor inaccuracies
> and concentrates upon substantial truth. [...] Minor
> inaccuracies do not amount to falsity so long as 'the
> substance, the gist, the sting, of the libelous charge
> be justified.'

198 W.Va. 339, 352 (1996) (quoting <u>Masson v. New Yorker</u>
<u>Magazine, Inc.</u>, 501 U.S. 496, 516-17 (1991)) (citations
omitted).  In the instant case, "the gist" of the defamatory

---

[4] Defendant Moore also argues that he is absolutely immune from
liability for any testimony he gave to the grand jury.  Def.
Moore's Mem. in Supp. of Mot. to Dismiss at *13.  It is not
apparent, however, that any part of the complaint asserts that
he testified before the grand jury.  Moreover, plaintiffs may
maintain their claim against Moore without relying on any
testimony before the grand jury, as explained above.

materials was that the plaintiffs were involved "in a scheme to commit grand larceny." Pl. Compl. ¶ 10. Plaintiffs also allege that, in actuality, they "had not violated any law." Pl. Compl. ¶ 19. Thus, plaintiffs have alleged falsity.

Defendant Fletcher also asserts that he did not "publish" any defamatory materials, and that any allegedly defamatory materials contained no reference to plaintiffs. Def. Fletcher's Mem. in Supp. of mot. to Dismiss at *8. The court is unpersuaded as to both points.

A libel plaintiff indeed must show a "communication" of defamatory statements "to a third party." Crump, 173 W. Va. at 703. West Virginia law considers the "communication" or "publication" requirement to be met by "any form of intentional or negligent communication of a defamatory statement to a third person, that is, to someone other than the originator and the person defamed." See Crain v. Lightner, 178 W. Va. 765, 772 (1987) (citations omitted). The court in Crain elaborated on the breadth of activity that constitutes "publication" and the fact that a statement may have multiple publishers:

> If, as a conspiracy, one person orally composes and
> dictates the statement, a second person sees that the
> composition is reduced to written or printed form and
> a third person brings the statement in such form to
> the attention of anyone other than the person defamed,

24

> each of the three persons who contributed to the
> communication is responsible as a "publisher" of
> libel.

Id.

Fletcher published the libelous statements by aiding Thornsbury in improperly influencing the grand jury's deliberations and by signing and sending the subpoenas to Hampden Coal.  See Crain, 178 W. Va. at 772.  The complaint states that Fletcher "met with Defendant [Thornsbury] at the 'Wine Seller', a business owned by their real estate development company," Pl. Compl. ¶ 16, and that Fletcher "collaborated . . . to further the nefarious schemes of Defendant Thornsbury," Pl. Compl. ¶ 25.  Fletcher then persuaded the grand jury to issue the subpoenas, and he signed them.  Pl. Compl. ¶¶ 16-17.  Fletcher's role in helping Thornsbury improperly influence the grand jury to issue the subpoena constitutes "publication" in the meaning of Crain, particularly given his control over the text that was approved by the grand jury.  See Crain, 178 W. Va. at 772 (imputing publication to one who "sees that the composition is reduced to written or printed form").  Fletcher also published the defamatory statements because he helped the subpoenas circulate to (at least) the grand jury members and the employees of Hampden Coal, all of whom are individuals "other than the person defamed," see Crain, 178 W. Va. at 772.

Last, the complaint alleges that the subpoenas referred to the plaintiffs, even if indirectly.  As stated above, "defamation may be accomplished through inference, implication, innuendo or insinuation," rather than "direct reference," <u>Crump</u> 173 W. Va. at 709, and such was the case here. Plaintiffs allege that "the [subpoenas were] purposefully crafted to insinuate that Plaintiffs were part of a scheme to steal mining bits," Pl. Compl. ¶ 18, and that they indeed caused the public and plaintiffs' business partners to believe that plaintiffs had been involved in criminal activity.  Such statements are sufficient, at this stage, to allege that the defamatory statements referred to plaintiffs.

Plaintiffs have thus stated a libel claim against all three defendants.  Accordingly, defendants' motions to dismiss the Count II libel claim are denied.

B.  Section 1983

Count I alleges that the defendants' actions violated the Due Process Clause of the Constitution and therefore give rise to a Section 1983 claim.

Section 1983 provides a private right of action to individuals who have suffered a violation of a constitutional or

federal statutory right by someone acting under purported state authority.  Hafer v. Melo, 502 U.S. 21, 27 (1991)("Through § 1983, Congress sought 'to give a remedy to parties deprived of constitutional rights, privileges and immunities by a[] [state] official's abuse of his position.'")(quoting Monroe v. Pape, 365 U.S. 167, 172 (1961)). Section 1983 reads, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

Section 1983 claims must be raised against a "person." The parameters of that designation are often at issue when assessing whether or not a suit filed nominally against a person is actually a suit against a non-person entity.[5]  See e.g., Will v. Michigan Dept. of State Police, 491 U.S. 58 (1989) (suit against Director of State Police in official capacity was actually suit against the state itself, which is not a person

---

[5] Some local government entities, such as municipalities, are considered persons for the purposes of Section 1983, and thus official-capacity suits can be maintained against them.  See Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).

27

for purposes of Section 1983). Government officials, as natural persons, fit within the definition of a person contemplated by Section 1983 so long as they are sued in their personal, not official, capacities. <u>Hafer</u>, 502 U.S. at 27 ("State officers sued for damages in their official capacity are not 'persons' for purposes of the suit because they assume the identity of the government that employs them. By contrast, officers sued in their personal capacity come to court as individuals. A government official in the role of personal-capacity defendant thus fits comfortably within the statutory term 'person.'")(internal citations omitted).

"[T]he distinction between official-capacity suits and personal-capacity suits is more than 'a mere pleading device.'" <u>Id.</u> (quoting <u>Will,</u> 491 U.S. at 71.). As the Supreme Court explained in <u>Kentucky v.Graham</u>:

> Personal-capacity suits seek to impose personal
> liability upon a government official for actions he
> takes under color of state law. Official-capacity suits,
> in contrast, generally represent only another way of
> pleading an action against an entity of which an officer
> is an agent . . . [A]n official-capacity suit is, in all
> respects other than name, to be treated as a suit
> against the entity. It is not a suit against the
> official personally, for the real party in interest is
> the entity.

473 U.S. 159, 165-66 (1985)(internal citations and quotation marks omitted). The distinction is relevant at the motion to

dismiss stage for two reasons.  First, it is often dispositive in a Section 1983 suit, because the plain language of the statute only permits actions against persons, and thus an action against a defendant in his official capacity fails as a matter of law if his official capacity is an alter-ego of the state. Second, the posture of the claim dictates what types of immunity a defendant may properly invoke: an official in a personal-capacity action "may, depending on his position, be able to assert personal immunity defenses," while in an action against the same named defendant in an official-capacity action, "the only immunities that can be claimed . . . are forms of sovereign immunity . . . such as the Eleventh Amendment."  <u>Id.</u> at 166-67.

1.   Official-Capacity Claims

The complaint alleges official-capacity claims against each of the defendants.  Defendants have moved to dismiss these claims, arguing that the official-capacity claims are actually claims against the state, and the state, as explained above, is not a "person" in the meaning of § 1983.

When determining whether a government official is an agent of the state or of a political subdivision for the purposes of Section 1983, the "inquiry is dependent on an analysis of state law."  <u>McMillian v. Monroe County</u>, 520 U.S.

781, 786 (1997).  "The pivotal consideration in determining whether an individual is an employee of a given entity is whether the purported employer has the power of control over the individual."  <u>Atkinson v. County Comm'n of Wood County</u>, 200 W.Va. 380, 383 (1997).  Thus, the status of the defendants is determined by whether or not there are "indicia of control" demonstrating that the state had control over the defendants. <u>Id.</u> at 383-84.

Thornsbury was a circuit court judge.  The West Virginia Constitution invests the West Virginia Supreme Court of Appeals, indisputably an instrumentality of the state, with "supervisory control" over West Virginia's circuit courts.  W. Va. Const. art. VIII, § 3.  Moreover, West Virginia law expressly requires that the salaries of circuit court judges be paid by the state treasury.  W. Va. Code § 51-2-13.  Consequently, it is evident that circuit court judges are subject to the control of the state itself, and that a suit against a circuit court judge in his official capacity is not against a person amenable to suit under Section 1983.

Fletcher was acting as the foreman of a grand jury. West Virginia law gives circuit courts, which are, as explained above, instrumentalities of the state, the power to convene grand juries.  W. Va. Code §§ 52-2-1, 52-2-3; W. Va. R. Crim.

P., Rule 6.  In addition, the circuit court appoints foremen
such as Fletcher.  W. Va. R. Crim. P., Rule 6.  Money paid to
grand jurors appears to come from the state treasury.  See W.
Va. Code §§ 52-2-2 ("The provisions of article one of this
chapter relating to petit juries, so far as applicable and not
inconsistent with the provisions of this article, shall be
observed and govern grand juries."); 52-1-19 ("The clerk of any
court upon which juries are in attendance shall make an entry
upon its record stating separately the amount which each juror
is entitled to receive out of the state treasury for services or
attendance during the term.").  Despite the independence
inherent in the functioning of a grand jury, it is plainly an
integral part of the state's judiciary, and it is supervised, to
the extent that it receives supervision, by state judges.  The
grand jury is not a freestanding political entity or the arm of
some political subdivision aside from the state, and plaintiff
makes no argument suggesting either of these two possibilities.
Accordingly, grand juries and their foremen are subject to the
control of the state, and no official-capacity suit can be
maintained against Fletcher.

        Moore was a West Virginia State Police Officer.  West
Virginia law clearly establishes that the West Virginia State
Police are an instrumentality of the state.  See West Virginia

31

Department of Public Safety Reorganization Act, W. Va. Code §
15-2-1 <u>et seq</u>.  Thus, a suit against Moore in his official
capacity is a suit against the state of West Virginia.
Accordingly, no official-capacity suit can be maintained against
Moore.

    2.     Personal-Capacity Claim

       The style of the plaintiffs' complaint makes it clear
that a Section 1983 claim is pursued against the defendants in
their personal capacities.  <u>See</u> <u>Biggs v. Meadows</u>, 66 F.3d 56, 59
(4th Cir. 1995)(holding that "a [Section 1983] plaintiff need
not plead expressly the capacity in which he is suing a
defendant" and noting that a complaint can be construed as
having alleged a personal-capacity claim on the basis of various
contextual factors such as "the plaintiff's failure to allege
that the defendant acted in accordance with a governmental
policy or custom," "a plaintiff's request for compensatory or
punitive damages," and even the nature of the "defenses raised
in response to the complaint" such as a defendant's invocation
of qualified immunity.).

       Section 1983 is "not itself a source of substantive
rights" but rather "a method for vindicating federal rights
elsewhere conferred." <u>Graham v. Connor</u>, 490 U.S. 386, 393-94

32

(1989) (citations omitted).  The plaintiffs here complain that
their due process rights were violated, and they seek relief for
those violations.  Pl. Compl. ¶ 34.

        The Due Process Clause of the Fourteenth Amendment
declares that no state may "deprive any person of life, liberty,
or property, without due process of law."  U.S. Const. amend.
XIV, § 1.  A claim under either the procedural or substantive
component of the due process clause requires that the plaintiff
specify a protected interest of which it was deprived.  See,
e.g., American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 59
(1999)("The first inquiry in every due process challenge is
whether the plaintiff has been deprived of a protected interest
in 'property' or 'liberty.'"); Board of Regents of State
Colleges v. Roth, 408 U.S. 564, 569 (1972) ("The requirements of
procedural due process apply only to the deprivation of
interests encompassed by the Fourteenth Amendment's protection
of liberty and property."); Gravitte v. North Carolina Div. of
Motor Vehicles, 33 F. App'x 45, 48 (4th Cir. 2002) (per curiam)
("A plaintiff seeking to assert a substantive due process claim
must allege the deprivation of a cognizable interest in life,
liberty, or property; a mere allegation of 'arbitrary'
government conduct in the air, so to speak, will not suffice.").

33

In their complaint, the plaintiffs highlight several potential deprivations of property or liberty.  Plaintiffs state that their counsel was informed by the prosecuting attorney that "Defendant Thornsbury had decided to issue a capias for [plaintiff] Ellis['s] arrest," and "[p]laintiff Ellis was then forced to leave his home to avoid being arrested," Pl. Compl. ¶ 24, although they do not allege that Ellis was ever taken into custody or that a capias was ever issued.  They also state that they were forced to hire an attorney and pay attorneys' fees to fight the subpoena, which sought business records, Pl. Compl. ¶¶ 21, 22, even though the subpoena has never been enforced, Pl. Compl. ¶ 26, and no business records are alleged to have been produced.  They nevertheless assert that "Plaintiff[s] were forced to produce private property [presumably, the business records] or risk incarceration."  Pl. Compl. ¶ 32.  They also highlight their loss of income from cessation of business with Hampden Coal as a result of the subpoenas.  Pl. Compl. ¶¶ 8, 31. The court must consider the proffered property and liberty interests to determine if they will allow the claim to proceed.

The first question is whether the issuance of a capias – a writ directing an officer to apprehend a defendant, See Capias, Black's Law Dictionary (10th ed. 2014) – impinges on a constitutional liberty interest if the capias is never executed.

34

The "liberty" protected by the Due Process Clause, it is true, "denotes not merely freedom from bodily restraint." <u>Roth</u>, 408 U.S. at 572 (quoting <u>Meyer v. Nebraska</u>, 262 U.S. 390, 399 (1923)).  It also includes "those privileges long recognized [. . .] as essential to the orderly pursuit of happiness by free men," including "the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience."  <u>Id.</u>

Here, however, plaintiff Ellis has not alleged that the capias directly curtailed any of the freedoms enumerated in <u>Roth</u>, or, indeed, any of his freedoms at all.  The complaint states that "Plaintiff had to live in fear that his liberty would be taken away from him," Pl. Compl. ¶ 24, but this allegation emphasizes that Ellis was ultimately not deprived of his liberty.  As the Eleventh Circuit has recently suggested, "the mere issuance of a warrant — absent arrest or prosecution" does not "amount[] to a deprivation of property or liberty." <u>Hill v. Hale</u>, No. 15-13592, 2016 WL 556293, at *1 (11th Cir. Feb. 11, 2016); <u>cf.</u> <u>Moody v. Daggett</u>, 429 U.S. 78, 89 (1976)(holding that prisoner "has been deprived of no constitutionally protected rights simply by issuance of a parole

35

violator warrant" before any determination of parole violation
or future sentence).

As noted, Ellis states also that, because of the
capias, he was "forced to leave his home to avoid being
arrested," Pl. Compl. ¶ 24, but the court interprets this to
mean that Ellis moved elsewhere because he had been informed of
a capias and perceived a need to evade the police.  It is not an
allegation that officers actually removed Ellis from his home.
Again, the lack of any direct deprivation of liberty worked by
the government removes Ellis's complaint from the ambit of the
Due Process Clause.  See Hill, 2016 WL 556293, at *1; cf.
O'Bannon v. Town Court Nursing Ctr., 447 U.S. 773, 788-89
(1980)(noting "simple distinction between government action that
directly affects a citizen's legal rights, or imposes a direct
restraint on his liberty, and action that . . . affects the
citizen only indirectly or incidentally," and stating that due
process protection "does not apply to the indirect adverse
effects of governmental action.").

A fruitful analogy may be drawn from the recent case
of Massey v. Ojaniit, in which the Fourth Circuit considered an
allegation that the police had fabricated evidence for use in a
criminal trial.  759 F.3d 343, 354 (4th Cir. 2014).  Despite the
disturbing nature of the alleged conduct, the court wrote that

36

the plaintiff's claimed Due Process violation must ultimately be grounded in an actual loss of liberty caused by that conduct:

> Fabrication of evidence alone is insufficient to state a claim for a due process violation; a plaintiff must plead adequate facts to establish that the loss of liberty — i.e., his conviction and subsequent incarceration — resulted from the fabrication.

Massey, 759 F.3d at 354 (citing Washington v. Wilmore, 407 F.3d 274, 282-83 (4th Cir. 2005)). Because the fabricated evidence could not be tied to the plaintiff's conviction and incarceration, the claim was dismissed. Massey, 759 F.3d at 355-56. Similarly, in this case, while defendants' alleged abuse of the machinery of justice is disturbing, it did not deprive Ellis of his liberty through incarceration or otherwise. Standing alone, the issuance of a capias, if it occurred, fails to ground a Due Process violation.

This reasoning applies equally to plaintiffs' suggestion that the subpoena's request for business records should be considered a deprivation of property. Pl. Compl. ¶ 21. Because the subpoena was never enforced, and plaintiffs do not claim that anyone ultimately seized their business records, they were never deprived of their property in the records. And the rationale applies also to plaintiffs' claim that they "were forced to produce private property," evidently in business

37

records, "or risk incarceration." Pl. Compl. ¶ 32. Because the complaint does not state that plaintiffs actually had to produce their property, nor that they were ever incarcerated, the government did not deprive them of either liberty or property.

The complaint also states that, "[a]s a direct result of defendants' actions Plaintiffs were forced to hire an attorney and pay attorney fees to fight the bogus subpoena issued by defendants." Pl. Compl. ¶ 22. But the Fourth Circuit has held, along with two other circuits, that an aggrieved party's expenditure of attorneys' fees does not constitute a deprivation of property absent a statute or other rule requiring the government to pay the fees. Patton v. Holland, 74 F.3d 1233 (4th Cir. 1996)(unpublished); Powell v. Fujimoto, 119 F. App'x 803, 806 (7th Cir. 2004); Workman v. Jordan, 32 F.3d 475, 482 n.4 (10th Cir. 1994). In Patton, a county employee sued the government for violation of his Due Process rights in conducting a disciplinary action against him, and claimed that "he was deprived of his property interest in recouping the attorney's fees he expended in contesting the proposed disciplinary action." 74 F.3d 1233 at *3. After showing the inapplicability of a state statute awarding attorney's fees for government employees in limited instances, the Fourth Circuit stated that

the plaintiff "has no property interest in attorney's fees."
Id.

The district court in All Aire Conditioning, Inc. v.
City of New York discussed the rationale for this rule.  979 F.
Supp. 1010, 1015 (S.D.N.Y. 1997), aff'd, 166 F.3d 1199 (2d Cir.
1998).  There, plaintiffs who frequently drove and parked
commercial vehicles sued the City of New York for improperly
ticketing their vehicles with great frequency, thus requiring
heavy expenditures of time and money to fight the tickets in
court.  The court wrote that plaintiffs had "failed to identify
any state law or other basis for supposing that the state has
created an entitlement to having one's time, or that of one's
employees, protected against the distractions inherent when one
decides to contest one or another government enforcement
action."  979 F. Supp. at 1015.  Absent such an entitlement, "it
is well established that citizens may be required to bear the
costs of defending against lawsuits," and that the "expense and
annoyance of litigation is part of the social burden of living
under government."  Id.  Moreover, recognizing a property
interest in court expenses would allow "litigants who
successfully defend against suits brought by the government . .
. to bring countersuits for defense costs on the theory that the
defense costs were a property interest of which they had been

39

deprived improperly," and such a rule would "work a sea change in American litigation." Id. at 1015-16. For the same reasons, plaintiffs' expenditure of money on an attorney in this case does not constitute a deprivation of property.

Plaintiffs next highlight their loss of business income from Hampden Coal, and suggest that it may serve as a property interest. In briefing this motion, they state that their "profits from the contract with Hampden Coal" are a property interest. See Pl. Resp. to Def. Moore's Mot. to Dismiss Am. Compl. at *5. The complaint also draws attention to their property interest in lost business income, stating that, "[a]t the time of the subpoena Plaintiffs had construction contracts with Hampden amounting to gross billings of $100,000 a month," Pl. Compl. ¶ 8, and that "[a]s a direct result of the subpoenas which caused Hampden Coal executives to become fearful that they were on the wrong side of the Mingo County political structure, Hampden Coal Company ceased doing business with Plaintiffs, which action cost Plaintiffs over the course of four years in excess of $4 million," Pl. Compl. ¶ 31.

In order to prevent the Constitution from becoming "a font of tort law to be superimposed upon whatever systems may already be administered by the States," the courts require a plaintiff to demonstrate a constitutionally-protected interest

40

with specificity.  <u>Paul v. Davis</u>, 424 U.S. 693, 700-01 (1976).
"A property interest requires more than a 'unilateral
expectation,'" and generally requires a "legitimate claim of
entitlement." <u>Mandel v. Allen</u>, 81 F.3d 478, 480 (4th Cir. 1996)
(quoting <u>Roth</u>, 408 U.S. at 577).

        Which contracts are "property," as that term is used
in the Due Process Clause, has proven to be a difficult
question.  "Many contracts establish 'legitimate claims of
entitlement,'" <u>Mid-Am. Waste Sys., Inc. v. City of Gary, Ind.</u>,
49 F.3d 286, 289 (7th Cir. 1995), which is the definition of Due
Process "property" supplied in leading cases such as <u>Roth</u>, 408
U.S. at 577.  Moreover, "a number of Supreme Court decisions
hold[] that a tenured job with the government . . . constitutes
a property interest," and "[e]xtension of these cases to a wide
variety of contractual claims appears conceptually easy."
Leonard Kreynin, Note, <u>Breach of Contract As A Due Process</u>
<u>Violation: Can the Constitution Be A Font of Contract Law?</u>, 90
Colum. L. Rev. 1098, 1101-02 (1990).  Indeed, in a plurality
opinion in <u>Brock v. Roadway Express, Inc.</u>, the Supreme Court
accepted the government's concession that "the contractual right
[of a private employer] to discharge an employee for cause
constitutes a property interest protected by the Fifth
Amendment."  481 U.S. 252, 260-61 (1987).

Particularly in the context of government contracts,
however, "[m]any courts . . . have hesitated to apply the logic
of <u>Roth</u> . . . to contracts outside of the traditional employment
context."  Zachary D. Krug, <u>Due Process and the Problem of
Public Contracts: A Critical Look at Current Doctrine</u>, 89
Cornell L. Rev. 1044, 1049 (2004).  In <u>Coastland Corp. v.
Currituck Cty.</u>, our court of appeals stated that a "mere breach
of contractual right is not a deprivation of property without
constitutional due process of law," because "[o]therwise,
virtually every controversy involving an alleged breach of
contract by a government [. . .] would be a constitutional
case."  734 F.2d 175, 178 (4th Cir. 1984)(quoting <u>Medina Jimenez
v. Almodovar</u>, 650 F.2d 363, 370 (1st Cir. 1981)).  This approach
has been followed by several other circuits, which have
generally been skeptical that a government contract constitutes
"property" unless it concerns some special status, particularly
employment.  <u>S & D Maintenance Co. v. Goldin</u>, 844 F.2d 962 (2d
Cir. 1988); <u>Unger v. National Residents Matching Program</u>, 928
F.2d 1392, 1397-1400 (3d Cir. 1991); <u>San Bernardino Physicians'
Services Medical Group v. County of San Bernardino</u>, 825 F.2d
1404 (9th Cir. 1987).  On the other hand, some courts, such as
the Seventh Circuit, have held differently.  In <u>Mid-Am. Waste
Sys.</u>, Judge Easterbrook laid out part of the case in favor of a
more expansive view in a wide-ranging discussion of the issue:

> Many contracts establish "legitimate claims of
> entitlement." How could they not? Courts routinely
> enforce them, awarding damages against those who go
> back on their word. The Constitution itself protects
> them; Art. I § 10 cl. 1 provides that "[n]o State
> shall [...] pass any [...] Law impairing the
> Obligation of Contracts." If the state confiscates a
> leasehold interest, it must pay "just compensation"
> under the takings clause of the fifth amendment — a
> provision that has been applied to the states through
> the due process clause of the fourteenth amendment, a
> step that is possible only if leaseholds are
> "property."

49 F.3d at 289; but see Taake v. County of Monroe, 530 F.3d 538,

541 (7th Cir. 2008) ("[C]aselaw from our circuit dispels the

notion that a substantive constitutional property interest

arises simply because a state actor breaks a contract with a

state citizen.").


        Few cases allege government damage to contracts

between private parties, but some courts of appeals have

considered a contract to be constitutional property in such a

case. Mertik v. Blalock, 983 F.2d 1353, 1360 (6th Cir. 1993);

Stein v. Bd. of City of New York, Bureau of Pupil Transp., 792

F.2d 13, 17 (2d Cir. 1986); Wilson v. MVM, Inc., 475 F.3d 166,

178 (3d Cir. 2007). In Mertik v. Blalock, the Sixth Circuit, on

the authority of Roadway Express, ruled that "a private

contractual right can constitute a property interest entitled to

due process protection from governmental interference under

federal constitutional law."[6]  983 F.2d at 1360.  <u>Mertik</u>

concerned a skating instructor who claimed that she had made

contracts with students to provide skating lessons, and that the

government had violated her Due Process rights by summarily

denying her access to the city's skating rinks.  983 F.2d at

1356-57.  The opinion turned on both the private contract Mertik

held with her students and Mertik's contract with the

government-owned skating clubs to teach there.  <u>Id.</u> at 1361-62.

The court determined that Mertik had asserted a property

interest in part because she "alleged the existence of valid

contracts with her students, in force at the time that she was

allegedly ordered off the ice by defendant Blalock, with no

breach or termination contemplated by the immediate parties to

the contracts." <u>Id.</u> at 1360-61.


        The court's opinion in <u>Mertik</u> is consonant with the

rulings in <u>Wilson</u>, 475 F.3d at 178, and <u>Stein</u>, 792 F.2d at 17,

both of which determined that private employment contracts

conferred constitutional property interests because they allowed

---

[6] A later Sixth Circuit case, <u>EJS Properties, LLC v. City of
Toledo</u>, 698 F.3d 845, 857 (6th Cir. 2012), also ruled that
contractual agreements could be the basis for Due Process
property interests, but stressed the importance of state law
dictating that contracts were a property interest.  The court
notes that the West Virginia Supreme Court of Appeals has made
clear its view that contracts implicate significant Due Process
interests.  <u>State v. Mem'l Gardens Dev. Corp.</u>, 143 W. Va. 182,
190 (1957).

an employer to discharge a worker only for "good cause".  The language of Stein suggests that the presence of an employment interest may be of importance in determining that a private contract is constitutional property, see Stein, 792 F.2d at 17 ("the state cannot transgress on the claim of entitlement to continued employment without due process of law").  The ruling in Mertik, however, where the contract related to labor but was not exactly an agreement of "employment," shows that the principle may be stretched beyond protecting the entitlement to an employment relationship.

The court, upon further review, concludes that the allegations are barely sufficient to state a loss of property in plaintiffs' business income at the motion-to-dismiss stage.  As noted above, plaintiffs have pleaded that they "had construction contracts with Hampden amounting to gross billings of $100,000 a month," and that, because of defendants' actions, "Hampden Coal Company ceased doing business with Plaintiffs."  Making all inferences in the plaintiffs' favor, the court reads these passages to state that plaintiffs held a contractual commitment for some business with Hampden Coal, thus creating a "legitimate claim[] of entitlement" to the income by virtue of the contract, Mid-Am. Waste Sys., 49 F.3d at 289.  Moreover, as in Mertik, defendants' conduct in this case "allegedly threatened"

45

plaintiffs' "means of livelihood," even if the contract was not
one for employment in the traditional sense.  Mertik, 983 F.2d
at 1361.  Thus, the fruits of the contract, particularly given
their relation to plaintiffs' livelihood, give rise to a Due
Process property interest.

     The amended complaint, compared to the first
complaint, alleges additional facts allowing plaintiffs to state
a Due Process claim despite suffering losses as a somewhat
indirect effect of government action.  In the earlier order,
this court stated, on the authority of O'Bannon, 447 U.S. 773,
that plaintiffs could not recover for their loss of business
income because it was an indirect result of government action.
The amended complaint, however, alleges what was at best obscure
before: that subpoenas were issued "to Hampden Coal Company and
plaintiffs," rather than simply to plaintiffs alone, Pl. Compl.
¶ 10 (emphasis added), and that both subpoenas were
"purposefully crafted to insinuate that Plaintiffs were part of
a scheme to steal mining bits," Pl. Compl. ¶ 18.  Defendants, in
other words, took action against Hampden in order to harm
plaintiffs.  In O'Bannon, the Supreme Court noted that this type
of conduct could indeed ground a Due Process claim:

     We of course need not and do not hold that a person
     may never have a right to a hearing before his
     interests may be indirectly affected by government

> action.  Conceivably, for example, if the Government
> were acting against one person for the purpose of
> punishing or restraining another, the indirectly
> affected individual might have a constitutional right
> to some sort of hearing.

447 U.S. at 789 n.22.  In stating that defendants served a

subpoena upon Hampden with the goal of harming plaintiffs, the

complaint now alleges that defendants were "acting against one

person for the purpose of punishing or restraining another."

The indirect character of the action thus may not constitute a

bar to their claim.

        Plaintiffs also allege a property interest in their

reputational damages.  See Pl. Compl. ¶ 27 ("[T]he fact that

Plaintiffs were being investigated was bruited about Mingo

County, [and the] rumors held Plaintiffs up to obloquy, ridicule

and contempt.").  It is well established that "reputation alone"

does not constitute a sufficient interest for a claim under the

Due Process Clause. See Paul v. Davis, 424 U.S. 693, 701 (1976)

(finding that "reputation alone" does not constitute "either

'liberty' or 'property' by itself sufficient to invoke the

procedural protection of the Due Process Clause"); Shirvinski v.

United States Coast Guard, 673 F.3d 308, 314-15 (4th Cir. 2012)

("[T]he Supreme Court has required plaintiffs in cases involving

allegedly defamatory statements by the government to show more

than reputational injury in order to prevail on a constitutional

claim."). In Paul, however, the Supreme Court noted that a plaintiff alleging reputational stigma could make out a due process claim by demonstrating, in addition to the reputational harm, that "as a result of the state action complained of, a right or status previously recognized by state law was distinctly altered or extinguished." Paul, 424 U.S. at 711; see also Shirvinski, 673 F.3d at 315 (finding that, to recover on a stigma-plus claim, the plaintiff "must demonstrate that his reputational injury was accompanied by a state action that 'distinctly altered or extinguished' his legal status if he wants to succeed"); Wisconsin v. Constantineau, 400 U.S. 433 (1971) (upholding plaintiff's claim where plaintiff was labeled as a person who produced certain undesirable conditions "by excessive drinking," and also was prohibited from purchasing alcohol for period of time). Some courts refer to such claims as "stigma plus" claims. See University Gardens Apartments Joint Venture v. Johnson, 419 F.Supp.2d 733, 738 (D. Md. 2006) (citing Velez v. Levy, 401 F.3d 75, 87 (2d Cir. 2005)).

Although plaintiffs in this case have alleged a loss of business income in addition to reputational harm, their injuries will not clear the hurdle to make a "stigma plus" claim. The plaintiffs' lost income counts as a property interest to the extent it was guaranteed by contract. But the

48

loss of this income does not constitute an "alter[ation]" or "extinguish[ing]" of the plaintiffs' "legal status."  A change in "legal status" is understood as a "remov[al] [of an] interest from the recognition and protection previously afforded by the state."  <u>Paul</u>, 424 U.S. at 711.  Generally, to show a change in "legal status," the plaintiff must point to the loss of a specific right, <u>see</u> <u>Constantineau</u>, 400 U.S. 433 (right to purchase alcohol), or to a loss of a specific state-provided benefit such as government employment, <u>see</u>, <u>e.g.</u>, <u>Shirvinski</u>, 673 F.3d 308.  In the instant case, the plaintiffs' loss of business with Hampden Coal simply reduced their income and made their business less valuable, rather than revoking any part of the state's legal recognition of their business dealings.

Additionally, defendant Fletcher contends that plaintiffs have not alleged any wrongful conduct on his part that would allow recovery for a due process violation.  Mem. in Supp. of Def. Fletcher's Mot. to Dismiss at *4 (noting that "there is no specific allegation of wrongful conduct on the part Jarrod Fletcher apart from his service as grand jury foreman").

Substantive due process bars "certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them.'"  <u>Zinermon v. Burch</u>, 494 U.S. 113, 125 (1990)(quoting <u>Daniels v. Williams</u>, 474 U.S. 327,

331 (1986)).   In Daniels, the Supreme Court explained that the protection provided by substantive due process was "intended to secure the individual from the arbitrary exercise of the powers of government" and "prevent governmental power from being used for purposes of oppression."   Daniels, 474 U.S. at 331 (internal citations and quotation marks omitted), see also County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)("the Due Process Clause was intended to prevent government officials 'from abusing [their] power, or employing it as an instrument of oppression.'")(quoting Collins v. City of Harker Heights, 503 U.S. 115, 126 (1992)), Dent v. State of West Virginia., 129 U.S. 114, 124 (1889)(explaining that "due process of law . . . is intended . . . to secure the citizen against any arbitrary deprivation of his rights" and that due process constrains government actors from the exercise of "'purely personal and arbitrary power'")(quoting Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886)).

"[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense." Lewis, 523 U.S. at 846 (internal quotation marks omitted).   In most instances, asserting a cognizable substantive due process claim requires a plaintiff to establish that he suffered from a government official's "abuse of power . . . which shocks the

conscience." <u>Id.</u> "While the measure of what is conscience shocking is no calibrated yard stick," <u>Lewis</u> explained that "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." <u>Id.</u> at 847, 849, <u>see also Daniels</u>, 474 U.S. at 331 ("Historically, [the] guarantee of [substantive] due process has been applied to <u>deliberate</u> decisions of government officials to deprive a person of life, liberty, or property.")(emphasis in original).

Plaintiffs have alleged that Fletcher illegally gained admission to a grand jury by failing to disclose his ineligibility to serve despite being asked about it. Pl. Compl. ¶ 13. He then helped Thornsbury to formulate subpoenas, and to influence the grand jury to approve the subpoenas' content and allow their service upon Hampden and Devco. Pl. Compl. ¶¶ 16, 17. This was done so Thornsbury could harm Ellis and Devco, and imprison Robert Woodruff, thus paving the way for him to have sex with his secretary, who was Woodruff's wife. Pl. Compl. ¶¶ 11, 19. Plaintiffs state that Fletcher and the other defendants knew that no crime had been committed. Pl. Compl. ¶ 18. Plaintiffs have stated, in short, that Fletcher helped officials pervert government power for their personal benefit, at the cost of other men's liberty and livelihoods. There is no question

that this activity is both "conscience-shocking" and "arbitrary in the constitutional sense."  It is "unjustifiable by any government interest."  Plaintiffs have thereby stated a claim for violation of the Due Process Clause of the Fourteenth Amendment.[7]

Because plaintiffs have stated a claim for violation of the Due Process clause of the Fourteenth Amendment, defendants' motions to dismiss the Count I Section 1983 claim are denied.

## IV. Conclusion

For the reasons set forth above, the court ORDERS that the three defendants' motions to dismiss should be, and they hereby are, denied.

---

[7] Defendant Moore states, also, that plaintiffs' Due Process claim should fail because "substantive due process claim may not be maintained where a specific constitutional provision protects the right at issue."  Moore's Mem. in Supp. of Mot. to Dismiss Amended Compl. at *9.  Moore does not, however, name any provision of the Constitution that covers the conduct alleged here.  The court thus rejects this argument.

The Clerk is directed to transmit copies of this order to counsel of record and any unrepresented parties.

ENTER:        May 27, 2016

John T. Copenhaver, Jr.
United States District Judge